658 A.2d 1218

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
JOSE LUIS REYES, DEFENDANT–RESPONDENT.

Argued January 31, 1995—Decided June 5, 1995.

*Gary H. Schlyen,* Chief Assistant Prosecutor, argued the cause for appellant (*Ronald S. Fava,* Passaic County Prosecutor, attorney).

*Edward P. Hannigan,* Assistant Deputy Public Defender, argued the cause for respondent (*Susan L. Reisner,* Public Defender, attorney; *Mr. Hannigan* and *William Welaj,* Designated Counsel, on the briefs).

*Nancy A. Hulett,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey, attorney; *Deborah T. Poritz,* Attorney General, attorney).

*Jose Luis Reyes* submitted a supplemental letter brief, *pro se.*

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns defendant's motion for post-conviction relief. Defendant asserts that the diminished-capacity charge given at his trial was unconstitutional under *State v. Breakiron*, 108 *N.J.* 591, 532 *A*.2d 199 (1987), and *State v. Zola*, 112 *N.J.* 384, 548 *A*.2d 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989), and that his appellate counsel's failure on direct appeal to object to that erroneous charge constituted ineffective assistance of counsel. Defendant further contends that counsel's assistance was ineffective because of his failure to assert that *N.J.S.A.* 2C:4–2 was unconstitutional based on *Humanik v. Beyer*, 871 *F*.2d 432 (3d Cir.), *cert. denied*, 493 *U.S.* 812, 110 *S.Ct.* 57, 107 *L.Ed.*2d 25 (1989).

## I. Facts

Jose Luis Reyes and Norma Martinez first met in October 1982, when Jose was twenty-two years old and Norma was sixteen, and shortly thereafter they moved in together. The couple lived together until June 1984, when Jose was imprisoned for narcotics possession. Norma could no longer afford the rent, so she and her sister, Teresita Martinez, moved into the apartment of a friend, Emie Pagan.

When Jose was released from jail a few months later, he and Norma resumed dating. Norma ended the relationship a short time later in September 1984, when Jose became jealous and physically abusive towards her, as he had been in the past. She told Jose that she did not want to see him anymore. Nevertheless, he continued to harass Norma, physically abusing her when he saw her on the street, and warning her not to date other men. Despite his threats, Norma secretly began dating another man.

On Sunday, October 28, 1984, Jose went to Emie Pagan's apartment to visit Norma. The two immediately began to argue over defendant's insistence that Norma was involved with another man. That argument attracted the attention of Emie, Teresita, and Roberto Perez, Teresita's boyfriend, who all went to the

doorway to investigate. Teresita told Jose to leave Norma alone, and Emie ordered Jose "to get the hell out [of her house]." Emie led Norma back into the apartment, with all but defendant following, and slammed the door shut.

Jose then went across the street to question Roberto's two nephews. Defendant demanded to know if either of them was dating Norma; both denied going out with her. Jose again returned to Emie's apartment, and asked to speak with Norma. Norma agreed to speak to defendant outside on the sidewalk, but he once more began to harass Norma. Teresita briefly argued .with Jose before going back inside the apartment. Defendant finally left the area at about 3:00 p.m.

Jose then went to New York City, where he indulged in a variety of intoxicants, purchasing and consuming a bag of "angel dust" (PCP), a "dime" bag of heroin (about ten dollars worth), some marijuana, and about a quart of alcohol. Later that evening, at about 7:45 p.m., he and two companions were picked up by a Port Authority police officer for being under the influence of a controlled dangerous substance.

At approximately 1:45 a.m., after he had been released on bail, defendant went to a nearby bar where he drank and played pool. Eventually, he and a friend, Ralphie, smoked a "dust 'joint" (a marijuana cigarette laced with angel dust, or PCP). Before leaving, Ralphie gave Jose another "dust joint," which defendant later smoked by himself.

Around 5:00 or 5:30 a.m., Jose let himself into the apartment of a friend, Eduardo Rosa, with a key that Eduardo had given him. Eduardo woke up when Jose turned on the light. Defendant told Eduardo about his arrest earlier that evening. Jose took a kitchen knife from Eduardo's apartment, and Eduardo saw Jose place the knife between his belt and pants. Eduardo asked Jose why he wanted the knife, to which he said Jose replied, laughing, "I want it for you." Jose then left Eduardo's apartment and headed for Emie Pagan's, which was about one hundred feet away.

When Jose arrived at Emie's apartment, he cut through a screen covering the bathroom window using a pair of snips he had stolen that day from Eduardo's garage. Once through the screen, Jose broke into Emie's apartment. Everyone was asleep. Jose entered and went directly to Emie's room, stabbing her several times in the arms and twice in the chest. At trial, the medical examiner testified that one of the wounds penetrated her heart, causing Emie's death, which probably occurred within fifteen to twenty minutes after she was stabbed.

Emie screamed when defendant stabbed her, her screams waking the others. Norma woke and ran to Emie's room. Defendant saw Norma, raced towards her, pushed her aside, and kicked in the door to Teresita's room. Norma grabbed defendant about his neck in a futile attempt to subdue him. Teresita and Roberto, who had been sleeping in Teresita's room, got up. Roberto ran over and struck defendant. Jose responded by trying to stab Roberto, but Roberto ducked, and Jose instead stabbed Teresita. Realizing she had been stabbed, Teresita ran screaming from the room. Jose tried to follow, but Norma and Roberto dragged him back into the bedroom. Roberto attempted to subdue Jose in a bear hug, but Jose flailed out and stabbed Roberto numerous times in the arms and legs.

Because it was still dark, Roberto did not realize he had been stabbed, and did not realize Jose had a knife until Jose stabbed him in the back. Bleeding profusely, Roberto fell to the floor and feigned death. Jose then terrorized Teresita and Norma for the next forty-five to sixty minutes. Jose ripped Teresita's clothes off, leaving her naked, and shoved her onto the sofa. Jose threatened to kill Norma and Teresita if they did not answer his questions regarding Norma's involvement with other men. Each time Norma did not answer a question to his satisfaction, Jose alternately punched her in the face, stabbed her in the leg, stomped on her, or sexually assaulted her by touching her vagina and threatening to stab her there.

Eventually, Norma managed to calm defendant down by promising to do whatever he wanted, so long as he would release her

sister unharmed. Norma agreed to go to Puerto Rico with defendant, and he allowed her to put some clothes on and pack. He also allowed her to call an ambulance for Teresita and the others.

Defendant took Norma back to Eduardo's apartment. Eduardo woke when the two came in, and defendant told Eduardo, "I stabbed some people in the house and maybe one [of] them could be ... dead or something." He told Norma that "she was lucky, that [he] got a gun ready for her." He threatened her, stating "I should kill you here and kill myself." Concerned over these threats, Eduardo took the knife from defendant and put it under his bed, advising defendant, "You got enough problems."

Realizing his shirt was stained with blood, defendant asked Eduardo for a clean shirt, which Eduardo gave him. Eduardo recognized that Norma needed prompt medical attention, so he borrowed his landlord's car and offered to take defendant and Norma to the hospital. While Eduardo was getting the car, however, defendant warned Norma, "You see what I did? If you ever do me wrong again[,] I'll do it again." Eduardo dropped Norma and defendant off at nearby Barnert Hospital. Because defendant had threatened to kill her if she signed in under her own name, Norma registered as Wanda Gonzalez.

Meanwhile, the police had taken Teresita and Roberto to Barnert Hospital. While awaiting treatment, the two sisters saw each other. Norma told her sister that defendant had brought her and was waiting for her; Teresita immediately told the police officer who had accompanied her to the hospital that defendant was in the hospital as well. The police officer recognized defendant in the waiting room and placed him under arrest, noticing that there was blood on the tips of defendant's shoes.

## II. Procedural History

### A. The First Trial

Defendant was indicted by a Passaic County Grand Jury on November 16, 1984. The indictment listed thirteen offenses:

burglary of Eduardo Rosa's garage, contrary to *N.J.S.A.* 2C:18–2 (count 1); burglary of Emie Pagan's residence, contrary to *N.J.S.A.* 2C:18–2b(1) & (2) (count 2); murder, contrary to *N.J.S.A.* 2C:11–3a(1) & (2) (count 3); felony murder, contrary to *N.J.S.A.* 2C:11–3a(3) (count 4); aggravated assault, contrary to *N.J.S.A.* 2C:12–1b(1) & (2) (counts 5, 9 & 12); terroristic threats, contrary to *N.J.S.A.* 2C:12–3a & b (counts 6 & 10); attempted aggravated sexual assault, contrary to *N.J.S.A.* 2C:5–1 and 2C:14–2a(3), (4) & (6) (count 7); attempted murder, contrary to *N.J.S.A.* 2C:5–1 and 2C:11–3 (counts 8 & 11); and possession of weapons for unlawful purposes, contrary to *N.J.S.A.* 2C:39–4 (count 13).

The case was tried as a capital case. Trial commenced June 16, 1986, and defendant testified on his own behalf. He did not dispute the facts set forth above, admitting that he had stabbed the victims, killing Emie Pagan and wounding Teresita Martinez, Norma Martinez, and Roberto Perez. His defense primarily consisted of his assertion that he did not recall the events and that he had been unable to form the requisite mental intent because he suffered from voluntary intoxication and diminished capacity due to mental defect or disease brought about by his long-term ingestion of drugs and alcohol. Defendant explained that he had broken into the apartment "just to talk to Norma." He asserted that Norma told him, "I don't love you. You don't want to change. I got me a better man. He's a better lover than you. He's better than you and I don't love you anymore."

According to defendant, when Norma told him this, he "lost [his] mind," and "went crazy, lost [his] head." He claimed that he did not regain his senses and "slow down" until Norma apologized and swore her love for him. Defendant said that he did not realize that he had killed Emie Pagan until after he had been arrested.

Defendant produced witnesses testifying to his drug and alcohol abuse on the night of the crimes. In particular, defendant's expert witness, Dr. Robert Sadoff, testified.concerning defendant's claim of diminished capacity. Several witnesses, however, includ-

ing the victims and the investigating officers, testified that defendant had not appeared to be under the influence of any drug at the time of the incident or shortly thereafter and had appeared to know what he had been doing.

At the close of the State's case, the trial court ordered an acquittal on count 1 (burglary of Eduardo Rosa's garage). The jury acquitted defendant on count 7 (attempted aggravated assault on Norma Martinez), but found defendant guilty on all remaining charges, including murder.

Because the State was prosecuting defendant under the capital-punishment statute, the court moved to the penalty phase. The jury unanimously found aggravating factor *N.J.S.A.* 2C:11–3(c)(4)(g) (murder committed during the course of a felony, burglary), and mitigating factors *N.J.S.A.* 2C:11–3(c)(5)(a) (defendant was under the influence of extreme mental or emotional disturbance) and *N.J.S.A.* 2C:11–3(c)(5)(d) (defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct was significantly impaired as the result of mental disease or defect or intoxication). However, the jury found that the aggravating factor did not outweigh the mitigating factors beyond a reasonable doubt, thus precluding imposition of a death sentence.

The trial court denied defendant's motion for a new trial and imposed an aggregate term of eighty-years imprisonment with a forty-five-year parole bar. Defendant's judgment of conviction was signed on August 1, 1986, and entered on August 5, 1986.

## B. The Direct Appeal

Defendant appealed his conviction to the Appellate Division, raising six points of error: (1) the trial court had improperly instructed the jury on voluntary intoxication; (2) the trial court had erred in admitting other-crimes evidence; (3) if the other-crimes evidence was properly admitted, then the trial court had erred in failing to give a limiting instruction on the other-crimes evidence; (4) the trial court had violated defendant's due-process rights by denying him the opportunity to cross-examine Norma

Martinez about her own drug use; (5) the prosecutor had exceeded the bounds of fair play during his opening statement to the jury; and (6) the trial court had erred in admitting inflammatory and unduly prejudicial photographs of the crime scene.

In his direct appeal, however, defendant focused primarily on the alleged error in the jury charge on voluntary intoxication, which he argued shifted the burden of proving voluntary intoxication to the defense. Nonetheless, the Appellate Division affirmed in an unpublished *per curiam* opinion issued March 27, 1989. The court analyzed the jury charge and determined that "the judge correctly charged the jury that where there is some evidence of voluntary intoxication, the burden remains with the State to prove that defendant could form the requisite intent necessary for conviction of the offense despite such intoxication." Accordingly, the Appellate Division found that, viewed in light of the entire jury charge, that instruction had adequately distinguished between voluntary intoxication and diminished capacity and had not impermissibly shifted the burden of proof of voluntary intoxication to defendant.

Defendant filed a petition for certification on May 24, 1989, raising essentially the same issues that he had raised before the Appellate Division. We denied defendant's petition on September 6, 1989, thus effectively ending defendant's direct appeal.

## C. Collateral Attack: Motion for Post–Conviction Relief

On August 5, 1991, defendant filed a timely motion for post-conviction relief. Defendant's principal contentions in his post-conviction-relief motion were that the charge on diminished capacity went beyond the limits established in *Breakiron, supra,* 108 *N.J.* 591, 532 *A.*2d 199 and *Zola, supra,* 112 *N.J.* 384, 548 *A.*2d 1022, both of which were decided after defendant's trial but before the filing of defendant's appellate brief; that the trial court's charge on diminished capacity at trial also violated *Humanik, supra,* 871 *F.*2d 432; and that appellate counsel's failure to raise

those trial-court errors on his direct appeal constituted ineffective assistance of counsel.

Although defendant's trial counsel and his appellate counsel were notified by defendant that ineffective assistance of counsel was going to be raised in the post-conviction hearing, neither attorney was subpoenaed and neither of them was questioned regarding his or her actions during the post-conviction-relief proceedings. Defendant did not testify regarding his claim.

During the post-conviction-relief hearing, the trial court stated that defendant's appellate counsel should have requested a rehearing from the Appellate Division on the basis of *Humanik* and should have raised the *Humanik* issue in defendant's petition for certification. Nevertheless, the trial court denied defendant's motion for post-conviction relief, finding that the record failed to disclose any underlying

> psychosis or some other mental disease or defect during the course of these incidents. [The record] reveals largely ... a man who was jealous, angry, out of control and probably somewhat affected by PCP and heroin and marijuana. Again, this is not diminished capacity.

Because the evidence did not support a diminished-capacity instruction, it should not have been submitted to the jury; therefore, any error in the charge given was harmless.

The Appellate Division reversed in an unpublished *per curiam* opinion. Though acknowledging that it was unclear whether *Humanik* would apply to motions for post-conviction relief, the Appellate Division found that the "jury instructions were clearly inconsistent with the dictates of *Breakiron* and *Zola*." Therefore, the Appellate Division found that it had to decide whether "defendant was deprived of effective assistance of counsel because his attorney did not raise the issue on direct appeal." The Appellate Division formulated that issue "not [as] whether the judge should have given the diminished capacity charge [but as] whether the erroneous instructions which were given may be deemed harmless on the theory that they should not have been given at all." The Appellate Division then likened this case to *State v. Galloway*, 133 *N.J.* 631, 628 *A.*2d 735 (1993), a decision issued four years after

defendant's direct appeal and a year and a half after the trial court denied defendant's post-conviction-relief motion. In *Galloway* we held that "[f]orms of psychopathology other than clinically-defined mental diseases or defects may affect the mental process and diminish cognitive capacity, and therefore may be regarded as a mental disease or defect in the statutory or legal sense" as contained in *N.J.S.A.* 2C:4–2. 133 *N.J.* at 643, 628 *A.*2d 735. With that as background, the Appellate Division concluded:

> While an error in not charging diminished capacity properly under *Humanik* can be deemed "harmless" if the proofs suggest no such charge should have been given, the same is not necessarily true when, as here, the charge also violated *Breakiron* and *Zola* and put a burden on defendant which was clearly unconstitutional under our State pre-*Humanik* interpretation of the constitution. Thus, here the failure to raise the issue clearly affected the result of the direct appeal.

Consequently, the Appellate Division reversed and granted defendant a new trial.

The State thereafter filed a petition for certification, which we granted. 138 *N.J.* 265 (1994). We now reverse.

### III. Development of the Diminished–Capacity Defense

Defendant's petition for post-conviction relief focuses primarily on the trial court's diminished-capacity charge. Therefore, we first review the chronological development of *N.J.S.A.* 2C:4–2, including the case law interpreting that statute. The diminished-capacity defense, like that found in *N.J.S.A.* 2C:4–2,

> emerged in large measure to ameliorate the relatively narrow concept of insanity under the *M'Naughten* test, and found its most fertile ground in capital cases, and cases in which the *mens rea* required premeditation. In short, the doctrine emerged from experience as an attempt to fashion a rational and coherent method for society to treat with compassion those among us who operate in the twilight of rationality.
>
> [*Muench v. Israel*, 715 *F.*2d 1124, 1143 (7th Cir.1983), *cert. denied*, 467 *U.S.* 1228, 104 *S.Ct.* 2682, 81 *L.Ed.*2d 878 (1984)]

Diminished capacity is a "failure of proof" defense: evidence of defendant's mental illness or defect serves to negate the mens rea element of the crime. Paul H. Robinson, *Criminal Law Defenses: A Systematic Analysis*, 82 *Colum.L.Rev.* 199, 206 (1982). This failure-of-proof defense of diminished capacity was adopted as part

of our State's enactment of the 1979 Code of Criminal Justice (Code), and allowed criminal defendants to introduce evidence relating to the impact of mental disease or defect on their state of mind. *See L.* 1978, *c.* 95.

The diminished-capacity defense in *N.J.S.A.* 2C:4–2 was amended in 1979 to create a rebuttable presumption that the defendant did not have or suffer from a mental disease or defect, that is, a presumption that the defendant is normal. *See L.* 1979, *c.* 178, § 11B. That amendment, however, failed to assign any burden-of-proof requirement for the defendant to overcome the presumption. Accordingly, the Legislature again amended the Code in 1981, requiring a defendant to prove the existence of a mental disease or defect by a preponderance of the evidence. *See L.*1981, *c.* 290, § 8. Defendant was tried under that 1981 amendment.

This Court upheld the constitutionality of the 1981 amendment in *Breakiron, supra,* 108 *N.J.* 591, 532 *A.*2d 199. In that case, we held that the Code "does not mean that the defendant must disprove that the act was knowing or purposeful. It means only what it says, that the defendant must show that he or she suffered from a mental disease or defect that is relevant to the mental state of the offense." *Id.* at 611, 532 *A.*2d 199. We further noted the unwavering requirement that "[t]he State must prove 'every fact necessary to constitute the crime.'" *Id.* at 612, 532 *A.*2d 199 (quoting *In Re Winship,* 397 *U.S.* 358, 364, 90 *S.Ct.* 1068, 1073, 25 *L.Ed.*2d 368, 375 (1970)). With respect to the assertion that it was impermissibly unfair to impose on the accused the obligation to prove by a preponderance of the proof the existence of the relevant disease or defect, we explained that

> the structure of the statute does nothing more than create an inference that the ordinary defendant is possessed of the capacity to reach the mental states required by the Code: the diminished capacity defense thus requires the defendant to establish that he or she is not such a person.... Whether or not mental disease or defect is established, the State always bears the burden of proving beyond a reasonable doubt the essential mental elements of the crime charged. But the presence or absence of mental disease or defect is not an essential element of the crime as defined by the Legislature.
>
> [*Breakiron, supra,* 108 *N.J.* at 613, 532 *A.*2d 199.]

We reversed Breakiron's conviction for murder and remanded for a new trial because of the original court's erroneous refusal to charge the jury that relevant evidence of defendant's mental disease or defect might have negated the culpable mental state. *Id.* at 621, 532 *A.*2d 199.

Less than a year later, we reiterated our *Breakiron* holding, that *N.J.S.A.* 2C:4–2 was constitutional, and proposed an appropriate jury instruction:

> The defendant must prove by a preponderance of the evidence that he suffers from a mental disease or defect. However, the prosecution must prove beyond a reasonable doubt that defendant's mental disease or defect did not negate the state of mind which is an element of the crime, that is, purposely or knowingly. In other words, the prosecution must prove beyond a reasonable doubt that defendant acted purposely or knowingly despite his mental condition.
>
> [*Zola, supra,* 112 *N.J.* at 402, 548 *A.*2d 1022.]

On the whole, we found the charge given in *Zola* to be balanced, placing on the defendant only the burden of showing the presence of a mental disease or defect that would or could negate the state of mind necessary for the crimes charged. *Id.* at 402–03, 548 *A.*2d 1022. "The State's burden, to establish the defendant's guilt beyond a reasonable doubt, never shifted." *Id.* at 403, 548 *A.*2d 1022.

Four days after the Appellate Division issued its *per curiam* opinion affirming defendant's conviction and sentence, the Court of Appeals for the Third Circuit in *Humanik, supra,* 871 *F.*2d 432, disagreed with our analysis of *N.J.S.A.* 2C:4–2. Although Humanik's jury charge on diminished capacity comported with our prior holdings in *Breakiron* and *Zola,* the Third Circuit found that it violated a defendant's due-process rights. *Id.* at 441–43, 548 *A.*2d 1022. That court found that the proposed charge approved in *Zola* had the effect of precluding jurors from considering evidence which, although casting doubt on the presence of the requisite mental state, did not rise to the level of a preponderance of the evidence. *Id.* at 443, 548 *A.*2d 1022.

> If the defendant's evidence on mental disease or defect is sufficient to raise a reasonable doubt about the existence of the requisite intent, it cannot constitutionally be ignored. If a defendant's evidence on mental disease or defect is sufficient

to raise a reasonable doubt about any element of the offense charged, he must be acquitted.

[*Ibid.*]

Because the *Zola*–approved charge might have created an impermissible "preponderance of the evidence filter," thereby precluding the jury from considering evidence dispositive of the defendant's mental state, the charge and the statute on which it was based were declared unconstitutional. *Ibid.*

Although the decision of the Third Circuit was not binding on New Jersey courts, *see State v. Coleman*, 46 *N.J.* 16, 35–38, 214 *A.*2d 393 (1965), *cert. denied* 383 *U.S.* 950, 86 *S.Ct.* 1210, 16 *L.Ed.*2d 212 (1966), the Court, through Chief Justice Wilentz, in order "not to jeopardize State criminal trials by the threat of federal *habeas* reversals," issued a memorandum to all trial court judges on October 27, 1989, stating that a defendant raising the *N.J.S.A.* 2C:4–2 diminished-capacity defense no longer need prove the defect or disease by a preponderance of the evidence. *See* 124 *N.J.L.J.* 1133 (November 2, 1989). We also called on our coordinate branches of government to examine and respond to that defect. *Ibid.* We later extended *Humanik* to appeals pending as of December 8, 1989, although we noted in our memorandum that "that fact does not require a reversal of every case presenting a diminished capacity issue. Other appellate principles may dictate a different result." *See* 124 *N.J.L.J.* 1562 (December 28, 1989) (summarizing Court's memorandum). Thus, we recognized that an erroneous charge under *Humanik* does not warrant an automatic reversal. On July 7, 1990, the Legislature amended *N.J.S.A.* 2C:4–2, deleting the offending language; that section now requires that a defendant invoking the diminished-capacity defense simply present some evidence of his or her mental disease or defect. *See L.*1990, *c.* 63, § 1.

It was not until two months after we had denied defendant's petition for certification, which ended defendant's direct appeal, that this Court stated that *Humanik* should be applied to cases pending on direct appeal. Subsequently, we explicitly adopted *Humanik* in the companion cases of *State v. Moore*, 122 *N.J.* 420,

585 A.2d 864 (1991), and *State v. Oglesby*, 122 *N.J.* 522, 585 A.2d
916 (1991), although the Appellate Division has nevertheless deter-
mined that "we are obliged to follow *Breakiron* [in post-conviction-
relief proceedings] unless the Chief Justice or our Supreme Court
directs otherwise." *State v. Culley*, 250 *N.J.Super.* 558, 564, 595
A.2d 1098 (App.Div.), *certif. denied*, 126 *N.J.* 387, 599 A.2d 164
(1991).

## IV. Harmless Error Analysis

### A. Under *Breakiron* and *Zola*

We issued our decisions in *Breakiron* and *Zola* on October 29,
1987, and August 16, 1988, respectively. Consequently, the trial
court did not have the benefit of our decisions in *Breakiron* and
*Zola* when it instructed Reyes's jury on diminished capacity. The
Appellate Division, in its review of the post-conviction-relief hear-
ing, found that the charge had failed to comply not only with
*Humanik*, but also with the principles enunciated in *Breakiron*
and *Zola*. We agree that the charge does not comply with
*Humanik*, but find that, taken as a whole, it does comply with the
requirements of *Breakiron* and *Zola*.

The court charged the jury, as defense counsel request-
ed, on voluntary intoxication and diminished capacity. The trial
court's instruction on diminished capacity, in pertinent part, read:

   Now, while the State has the burden of proof on each and every element of the
offense, including state of mind or intent, the defendant has the burden by the
preponderance of the evidence to show a mental disease or defect which prevented
him from being able to form the requisite state of mind....

   . . . .

   [D]efendant ... must carry the burden of proving the defense of mental disease
[or] defect by a preponderance of the evidence.... Keep in mind, however,
although the burden rests upon the defendant to establish the defense of mental
disease or defect by a preponderance of the credible evidence, the burden of
proving the defendant guilty of the offenses charged beyond a reasonable doubt is
on the State and that burden never shifts. The State must prove all of the
elements of the crime charged beyond a reasonable doubt, including the element
relating to the necessary state of mind or intent.

I have told you that the State bears the burden of proving beyond a reasonable doubt that the defendant purposely or knowingly caused serious bodily injury resulting in Emie Pagan's death.... You must consider whether the defendant was harboring a mental defect and by virtue of that fact, that he did not have the mental capacity to knowingly or purposefully kill Emie Pagan.

. . . .

Now, you will also have to consider the defense of diminished capacity due to mental disease or defect with respect to the [count] charging felony murder, burglary and attempted aggravated sexual assault.

. . . .

In summary, while the State may prove or must prove all of the elements of the offense, including state of mind, by proof beyond a reasonable doubt, the defendant has the burden by a preponderance of the evidence of showing a mental disease or defect which prevented him from being able to be capable [sic] of forming the requisite intent he had in this case. If he satisfies his burden as to inability or incapacity to form the requisite intent due to mental disease or defect or intoxication by drugs and/or alcohol, he can't be convicted of a crime requiring proof of that state of mind.

It is a "well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 *U.S.* 141, 146–47, 94 *S.Ct.* 396, 400, 38 *L.Ed.*2d 368, 373 (1973) (citing *Boyd v. United States*, 271 *U.S.* 104, 107, 46 *S.Ct.* 442, 443, 70 *L.Ed.* 857 (1926)). Therefore, we look at the allegedly erroneous jury instruction not on its own, but in context of the entire charge.

▮ Although some portions of the judge's charge to the jury, which consisted of approximately twenty-four pages of transcript, might have been confusing, we find that the charge nonetheless comported with *Breakiron* and *Zola.* The trial court made abundantly clear that the burden of proving beyond a reasonable doubt that defendant *was* capable of forming the necessary intent at the time of the murder, despite the presence of mental disease or defect, always remained on the State. The charge, read as a whole, never removed from the State the ultimate burden of proving beyond a reasonable doubt that defendant had acted purposely or knowingly, regardless of his intoxication and/or diminished capacity due to mental disease or defect. The jury charge was valid under the law as then understood.

Defendant's direct appeal was heard by the Appellate Division on March 7, 1989, and decided on March 27, 1989. At that time, those mental diseases or disorders that constituted diminished capacity were based mainly on our analysis in *Breakiron.* Although we declined in that case "to define the content of the phrase 'mental disease or defect' as embraced by the ·Code," *Breakiron, supra,* 108 *N.J.* at 619, 532 *A.*2d 199, we did note that the drafters of the Model Penal Code recognized that " 'many mentally disturbed persons are [quite] capable of acting purposefully or knowingly in the minimal senses intended by the Model Code.' " *Id.* at 618, 532 *A.*2d 199 (quoting American Law Institute, *Model Penal Code and Commentaries* (Official Draft and Revised Comments), at 220, (comment to § 4.02) (1985)). We further stated:

> *Not every mental disease or defect has relevance to the mental states prescribed by the Code.* The variety and forms of mental disease are legion. They range from paranoia and schizophrenia to affective disorders and psychopathy. *Some, such as depression and anti-social disorders, have little or no relevance to knowledge.* Others, such as schizophrenia, are clearly relevant. Some states have attempted to define the relevant mental diseases. Our Code does not. But "[b]oth jurists and mental health professionals recognize that there is no perfect correlation between legal standards of 'insanity' and psychiatric classifications of mental disorder."
> [*Breakiron, supra,* 108 *N.J.* at 618–19 n. 10, 532 *A.*2d 199 (citations omitted) (emphasis added).]

Consequently, on that basis, a reviewing court looking at the evidence introduced on Reyes's behalf to demonstrate his mental disease or defect would have concluded that defendant's rage and intoxication, his depression, personality type and "lack of control of behavior," as described by his expert witness, did not constitute that quantum of evidence sufficient to support a diminished-capacity charge.

That determination is reenforced by our decision in *State v. Pitts,* 116 *N.J.* 580, 562 *A.*2d 1320 (1989), issued just two months after Reyes's unsuccessful direct appeal. In a case strikingly similar to Reyes's, Pitts alleged that he could not form the requisite mental state because of mental disease or defect, and that the trial court had committed plain error when it failed to charge diminished capacity. *Id.* at 607, 562 *A.*2d 1320. Pitts's

expert witness testified to the defendant's "cyclothymic personality disorder," a mood disorder that can, at times, cause significant depression, but is not as severe as manic depression, where the manic depressive loses touch with reality. *Id.* at 608, 562 *A.*2d 1320. That expert witness also testified that the defendant had a chronic anxiety disorder, characterized by "unrealistic or excessive anxiety manifested by tension and hyperactivity." *Id.* at 608–609, 562 *A.*2d 1320 (citation omitted).

Like Reyes's expert, Pitts's psychiatric expert testified, based on tests of and interviews with the defendant, that Pitts had manifested

> a loss of control under the influence of extreme emotions and what I would say, combining all the data, a rage reaction, a reaction in which his anger reached the point of rage, which I would define as an anger that goes out of control and an anger which interferes with the cognitive ability a person has, planning, judgment, recognizing consequences, deliberating, that in my opinion, he experiences such a loss of control.
>
> [*Pitts, supra,* 116 *N.J.* at 609, 562 *A.*2d 1320.]

Despite this testimony, we refused to find that the trial court had committed plain error when it failed to give Pitts the benefit of a diminished-capacity charge, reiterating our earlier admonition that " '[n]ot every mental disease or defect has relevance to the mental states prescribed by the Code.' " *Ibid.* (quoting *Breakiron, supra,* 108 *N.J.* at 618 n. 10, 532 *A.*2d 199).

■ Under the law as it developed during defendant's direct appeal, Reyes's case is remarkably similar to *Pitts.* Both defendants killed in a fit of rage, but neither linked that rage to an underlying mental disease or defect. As it was not error to deny Pitts a diminished-capacity jury charge, neither was it error to give Reyes a flawed diminished-capacity jury charge because he had not been entitled to such a charge in the first place. If there was any error in Reyes's jury charge, it was harmless because he received the potential benefit of a charge to which he had not been entitled.

## B. Under Humanik

The diminished-capacity charge, however, did contain the "preponderance of the evidence filter" condemned by the Third Circuit in *Humanik*. Although the charge does not comport with *Humanik*, we find that any error was harmless. Specifically, there was no competent evidence that defendant suffered from a mental defect or disease that impaired his cognitive capacity to act knowingly and purposely.

We have reviewed the testimony of all the witnesses, reading with particular care the testimony of defendant's expert witness, Dr. Robert Sadoff, a psychiatrist affiliated with the University of Pennsylvania. Based on his understanding of the incident as related to him by defendant, as well as defendant's use of drugs and alcohol, Dr. Sadoff testified that defendant "was in an altered state of consciousness at the time of the stabbing in the sense that he was in a rage and he was under the influence of the intoxicants that he had taken" and that "when [defendant] lashed out, he did so impulsively and in an emotional passion, rather than in a controlled, deliberate fashion." He further opined that defendant "did not act consciously with a full awareness and a full deliberation about his behavior." In Dr. Sadoff's view, defendant's actions "could not have been a purposeful, deliberate, planned attack, but [rather] happened in a rage, in a loss of control."

A careful review of Dr. Sadoff's testimony reveals that diminished capacity was not present. On direct examination, Dr. Sadoff stated his position as follows:

Q. And if a mental defect as opposed to a mental disease had to be present for that diminished capacity to exist, would you say or be able to say if there was a mental defect or temporary defect?

A. The defect would be that he was depressed over the situation; the defect would be that he was under the influence of intoxicants and that his judgment was impaired.

It's not a mental illness as an illness goes. It's not schizophrenia. There is a depressive element and there is a lack of control of behavior because of the combination of the rage, of the intoxicants.

He also testified to defendant's rage, to defendant's explosive and emotional personality, and to defendant's asserted intoxication on the night of the murder. However, on cross-examination, Dr. Sadoff indicated that defendant neither showed signs of underlying organic brain disorder, nor had any prior history of psychiatric disorders. The expert admitted that his evaluation was based almost entirely upon defendant's uncorroborated version of the facts, wherein defendant asserted that he had inadvertently stabbed Emie when she stepped between him and Norma during their argument. The prosecutor very effectively revealed the unsubstantiated and unreliable bases on which the doctor grounded his evaluation. The court at the post-conviction-relief hearing agreed, stating, "It is clear to this Court that Dr. Sadoff had not reviewed the discovery in its entirety. This, to me, is a serious flaw when evaluating the state of mind of the defendant."

Moreover, when confronted on cross-examination with the State's version of the events and asked to give an opinion based on that version, Dr. Sadoff testified:

> I think it boils down to the manner in which the events occurred. Very clearly, that if they occurred in a deliberate manner with the hammer and the rope and the knife and the [snips], and the gun and the plans and the thinking about it, the threats and all of these things and the confrontation that I thought happened that he told me happened at the time of the stabbing, if that actually happened 12 hours or more before and he cut into the window, passed by Norma, went right over to Emie's bed and plunged a knife into her heart without saying anything to anybody, no argument, no confrontation, nothing, then it's purposeful.

> If there is a confrontation, even if there was one before, but there's a second one after he gets out of jail after midnight and he's in the apartment even with the knife and he has an argument with Norma and sees the hickey and talks about the hickey with her, and Emie steps in between at that point to support Norma and against Jose, and he pulls the knife then cuts Emie, not in her bed, but in the course of the argument where he lost control, then I would say there's a difference and there's a problem with respect to knowing and purposeful. Those are the differences.

When shown a photograph of Emie Pagan's body as found by the police—half-naked in her bedroom and with blood on her bed and beside it but nowhere else in the apartment—Dr. Sadoff admitted that that presented a scenario more consistent with the State's version of the events. Dr. Sadoff also opined that defendant "was

not mentally ill such that he did not know the nature and quality of his act and did not know that it was wrong. That's what I said, and I'll stand by that."

We agree with the trial court's conclusion in the post-conviction-relief hearing that

Dr. Sadoff never identified an underlying mental disease or defect which could affect purpose or knowledge or seriously impair cognition. He speaks of depression, jealousy, of emotional deprivation, inadequate behavioral control, primitive rage. None of these disorders affect purpose or knowledge. Indeed, the doctor seemed to primarily focus upon the jealousy and anger in combination with the use of PCP and heroin and marijuana as causing the defendant to lose control, to "act wild act crazy." But this is not diminished capacity. This is motive plus intoxication due to drugs....

Dr. Sadoff said repeatedly that there was no underlying mental illness and opined that the defendant was not psychotic. Again, he never identified a mental disease or defect except rage or impulsivity. This clearly is not diminished capacity. In addition, my review of the evidence in this case, and I reviewed every word of the testimony, reveals nothing to indicate exhibition of psychosis or some other mental disease or defect during the course of these incidents. It reveals largely, as Dr. Sadoff testified, a man who was jealous, angry, out of control and probably somewhat affected by PCP and heroin and marijuana. Again, this is not diminished capacity. It is motive plus personality description plus some degree of intoxication from drugs.

Thus, the Appellate Division's reliance on *Galloway* is misplaced, because it reads *Galloway* too broadly. In that 1993 case, we overturned the murder conviction of the defendant, and although we declined to define "mental disease or defect" as used in the Code, we gave the phrase a broad reading, stating that "[f]orms of psychopathology other than clinically-defined mental diseases or defects may affect the mental process and diminish cognitive capacity, and therefore may be regarded as mental disease or defect in the statutory or legal sense." 133 *N.J.* at 643, 628 *A.*2d 735 (citation omitted).

In *Galloway* we spoke of "mental deficiencies," but observed that there must be evidence of an underlying mental defect or disease, and that a connection is necessary between that mental disease or defect and the defendant's ability to form the required mental state for the crime charged. *Id.* at 647, 628 *A.*2d 735. Under the Appellate Division's interpretation of *Galloway*, a de-

fendant without any mental defect or disease could satisfy the diminished-capacity test.

Defendant was possessed of a violent, explosive personality, and he might have been depressed over the break-up of his relationship with Norma. However, defendant was never diagnosed as suffering from some type of underlying mental disease or disorder. *Cf. Galloway, supra,* 133 *N.J.* at 647–49, 628 *A.*2d 735 (noting that defendant asserting diminished-capacity defense had been *diagnosed* as having borderline personality disorder with isolated explosive disorder as secondary diagnosis).

Dr. Sadoff stated that defendant had been impaired because of emotional rage combined with the voluntary ingestion of intoxicants. Those intoxicants had the effect of making defendant even less able to control his violent emotions. Although the doctor opined about the lack of full consciousness or deliberation, he did not outline any underlying mental deficiency. In fact, as noted above, defendant had no underlying mental disorder at all.

## V. Failure to Raise *Humanik* Error on Direct Appeal Did Not Render Counsel's Assistance Ineffective

Defendant asserts ineffective assistance of counsel because his attorney during his direct appeal failed to raise the issue of *Humanik* –type error in the jury charge before the Appellate Division or in his petition to this Court. We find that that failure to raise *Humanik* in the earlier proceedings did not constitute ineffective assistance of counsel. Because we conclude that the issue of diminished capacity was not present, if defendant had raised the issue on his direct appeal the reviewing court would have found any error harmless. Defendant's ineffective-assistance-of-counsel argument is thus moot because counsel's failure to raise the diminished-capacity issue could not have prejudiced defendant's direct appeal. *See Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984); *State v. Fritz,* 105 *N.J.* 42, 519 *A.*2d 336 (1987).

## VI. Conclusion

We find that the jury charge was consistent with our decisions in *Breakiron* and *Zola.* That charge did not, however, comport with *Humanik.* Nevertheless, because the evidence that Reyes presented on diminished capacity failed to establish the presence of a mental disease or defect, that error was harmless.

The judgment of the Appellate Division is reversed, and defendant's motion for post-conviction relief is denied.

*For reversal*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.