810 A.2d 588

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. SHAWN MILNE, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 30, 2002—Decided December 3, 2002.

Before Judges KING, WECKER and FUENTES.

*Mark A. Berman* argued the cause for appellant (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Berman* and *Philip James Degnan,* on the brief).

*Lisa Sarnoff Gochman,* Deputy Attorney General, argued the cause for respondent (*David Samson,* Attorney General of New Jersey, attorney; *Ms. Gochman,* of counsel and on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

This case involves defendant's claim for post-conviction relief. *R.* 3:22. He asserts that under the version of *N.J.S.A.* 2C:4–2, the "diminished capacity" defense, in force at the time of his trial in 1987, he was denied due process of law when convicted of knowing and purposeful murder, *N.J.S.A.* 2C:11–3, for a crime committed in 1985. At that time in 1987 *N.J.S.A.* 2C:4–2 stated:

2C:4–2 Evidence of mental disease or defect admissible when relevant to element of the offense.

Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense. *Mental disease or defect is an affirmative defense which must be proved by a preponderance of the evidence.* N.J. Stat. Ann. § 2C:4–2 (emphasis supplied).

Defendant claims the right to a new trial on the murder charge because of this constitutional deprivation.

The State asserts that defendant is not entitled to relief because of the procedural bars of prior adjudication, *R.* 3:22–5, and the five-year time limit, *R.* 3:22–12. The State also claims that defendant, in these circumstances, is not entitled to any retroactive benefit of the Third Circuit's ruling in *Humanik v. Beyer,* 871 *F.*2d 432 (3d Cir.), *cert. denied,* 493 *U.S.* 812, 110 *S.Ct.* 57, 107 *L.Ed.*2d 25 (1989), holding the extant (1987) version of *N.J.S.A.* 2C:4–2 unconstitutional.

We conclude that defendant is entitled to a threshold evidentiary hearing per *N.J.R.E.* 104(a) on the issue of admissibility of his anticipated proffer of evidence on this point: is the evidence which defendant would present at a new trial sufficient for jury consideration on his criminal state of mind or is the evidence too weak and vague to create a jury issue on diminished capacity under controlling case law?

John M. Cannel, in his annotations to the Criminal Code, succinctly and precisely recites the history of the so-called *Hu-*

*manik* dilemma and *N.J.S.A.* 2C:4–2. Because we cannot improve upon this analysis, we set it forth completely.

*History.* The history of this particular section is uniquely interesting. As originally proposed, it was intended only to make clear that certain evidence regarding mental disease or defect was relevant. Courts had been reluctant to admit such evidence when it was not part of an "insanity" defense. See e.g. discussion in *State v. Molnar,* 81 *N.J.* 475, 489–490, 410 *A.*2d 37 (1980). The commissioners wanted to make it clear, however, that whether or not the "insanity" defense was to be raised, the defendant's mental state would always be subject to scrutiny; this would be so because mens rea, as an element of nearly every offense, is a fact issue to be decided by the jury. See Commission Commentary 1, below. Consequently 2C:4–2, as proposed, was directed entirely to the admissibility of evidence relating to the impact of mental disease or defect on defendant's state of mind, whether or not that impact was such as to provide a 2C:4–1 defense.

As originally enacted, the section differed only slightly from that proposed. Following the Model Penal Code, it gave defendants a right to admit mental disease or defect evidence when relevant to any state of mind which is an element of this offense. By contrast, the commissioners had recommended only that defendants be given a right to admit such evidence insofar as it bore on that *purpose* which was an element of the offense, the admissibility of other state of mind evidence being left to the court's discretion. See Commission Commentary paragraph 2 below. The Code provision as enacted also differed from the commission's proposal in eliminating a paragraph which would have permitted the use of such evidence in mitigation of a death sentence. See Commission Commentary paragraph 3 below. It retained a paragraph permitting the prosecution to offer evidence in rebuttal. See Commission Commentary 4 below.

After enactment, the section was amended by L.1979, c. 178, which added a sentence pointing out that in the absence of evidence of mental disease or defect, defendant would be presumed to have none. This made clear that unless such evidence was introduced by the defendant, the State never had to address the issue in its proof of mens rea. Simultaneously, the paragraph providing that the State could rebut was dropped as unnecessary, since there is no doubt of the State's right to offer rebuttal evidence. After the 1979 amendment, however, there was a perceived problem as to how much proof the defendant had to introduce in order to have the jury consider whether the defendant lacked the capacity to form the required mental state. Thereafter, the legislature, by L.1981, c. 298, added a final sentence, placing the burden on the defendant to prove mental disease or defect by a preponderance of the evidence. The effect was to transform the section from one intended to deal solely with admissibility of evidence into what appeared to be a second mental impairment defense distinct from insanity. See *State v. Breakiron,* 210 *N.J.Super.* 442, 510 *A.*2d 80 (App.Div.1986), rev'd on other grounds 108 *N.J.* 591, 532 *A.*2d 199 (1987); *State v. Jasuilewicz,* 205 *N.J.Super.* 558, 572, 574, 501 *A.*2d 583 (App.Div.1985), certif. den. 103 *N.J.* 467, 511 *A.*2d 649 (1986), and compare *State v. Humanik,* 199 *N.J.Super.* 283, 291–295, 489 *A.*2d 691 (App.Div. 1985), certif. den. 101 *N.J.* 266, 501 *A.*2d 934 (1985), rev'd sub. nom. *Humanik v.*

*Beyer,* 871 *F.*2d 432 (3d Cir.), cert. den. 493 *U.S.* 812, 110 *S.Ct.* 57, 107 *L.Ed.*2d 25 (1989).

Following *Humanik v. Beyer, supra,* which declared the section unconstitutional because of the implications of the last sentence, that sentence was deleted by L.1990, c. 63, § 1. In reading the Commission Commentary it is necessary to keep in mind the changes made in the section since the commissioners wrote. Note that in deleting the last sentence of the 1981 version of the statute, which had placed on the defendant the burden of proving mental disease or defect by a preponderance of the evidence, the legislature returned to the original commission purpose for the section, authorizing introduction of certain relevant evidence. In the legislative note from the Criminal Justice Committee accompanying the 1990 deletion the section was characterized as one "with regard to the introduction of evidence." See also *State v. Reyes,* 140 *N.J.* 344, 354–365, 658 *A.*2d 1218 (1995), for the Supreme Court's lengthy discussion of the development of the diminished-capacity defense. And see *State v. L.C.,* 283 *N.J.Super.* 441, 662 *A.*2d 577 (App.Div.1995), certif. den., 143 *N.J.* 325, 670 *A.*2d 1066 (1996).

[*Cannel, Criminal Code Annotated,* Comment *N.J.S.A.* 2C:4–2 at 219–220 (2002).]

# I

This is the procedural background. On November 14, 1985 defendant, then age fifteen, was charged in a delinquency complaint with an offense which, had he been tried as an adult, would be murder under *N.J.S.A.* 2C:11–3a(1) and (2). The State moved on December 4, 1985 for waiver or referral of jurisdiction from the Family Part of Ocean County, Chancery Division to the Law Division of the Superior Court to try defendant as an adult. *R.* 5:22. The motion was denied. The State appealed this refusal to waive jurisdiction and we reversed. *State in Interest of S.M.,* 211 *N.J.Super.* 675, 512 *A.*2d 570 (App.Div.1986). Defendant filed a motion to re-open the juvenile waiver hearing and a motion for reconsideration to vacate the judgment. These motions were denied.

An Ocean County Grand Jury then charged defendant with committing these crimes against the victim: (1) purposely and knowingly causing the victim's death, *N.J.S.A.* 2C:11–3a(1)(2); (2) causing the death of the victim during the commission of a sexual assault, *N.J.S.A.* 2C:11–3a(3), and (3) using physical force or

coercion upon the victim during unlawful commission of sexual penetration causing severe personal injury, *N.J.S.A.* 2C:14–2a(6).

A trial commenced on June 10, 1987 before Judge Huber and a jury. On June 29, 1987 the jury convicted defendant of knowing and purposeful murder and aggravated sexual assault. Defendant was sentenced on July 23, 1987 to a term of thirty years with no possibility of parole on the murder count, and to a consecutive term of twenty years with a ten-year parole disqualifier on the aggravated sexual assault count. On August 18, 1987 defendant filed a notice of appeal raising nine issues, including two concerning sentencing. We affirmed the conviction in an unpublished opinion on October 13, 1989 (A–038–87T4) but modified the sentence, removing the ten-year parole disqualifier.

On December 15, 1989 defendant filed a petition for certification with the New Jersey Supreme Court. That petition was denied on January 23, 1990. 121 *N.J.* 612, 583 *A.*2d 313 (1990). Defendant then filed a petition for *certiorari* with the United States Supreme Court which was denied on October 1, 1990. 498 *U.S.* 840, 111 *S.Ct.* 116, 112 *L.Ed.*2d 85 (1990).

On July 21, 1992 defendant filed his first petition for post-conviction relief raising issues related to the statutory restrictions on his diminished capacity defense, denial of the right to a fair trial because of the effects of anti-psychotic drugs administered during trial, and ineffective assistance of trial counsel. Defendant's petition was denied on March 16, 1993 by Judge Giovine. Defendant appealed that decision and we affirmed in an unpublished opinion on August 19, 1994 (A–4670–92T4). On November 16, 1994 our Supreme Court denied defendant's petition for certification. 139 *N.J.* 186, 652 *A.*2d 174 (1994).

On September 4, 1997 defendant filed an application for a writ of habeas corpus in the United States District Court for the District of New Jersey raising the same three issues asserted in his initial petition for post-conviction relief. On October 21, 1999 Judge Cooper stayed the proceeding, allowing defendant to return to state court to exhaust his diminished capacity claim.

Consistent with the order of Judge Cooper, defendant filed a second petition for post-conviction relief on August 17, 2000 in the Ocean County Superior Court. Judge Citta denied relief on May 14, 2001. Defendant filed this appeal on June 16, 2001.

## II

These facts about the crime are taken from our opinion in A-38-87T4, October 13, 1989, affirming defendant's conviction.

On November 12, 1985, thirteen year old Barbara Harrison, the victim, was reported missing by her parents. She had last been seen a few hours earlier by a friend who had accompanied her to a convenience store on Fischer Boulevard in Toms River, New Jersey, where they had purchased candy and nuts. At approximately 11:00 p.m. that evening, the police found Barbara's body, nude from the waist down, in a creek located in a wooded area near Garfield Avenue, which runs parallel to Fischer Boulevard. The autopsy revealed that Barbara died from "asphyxia due to drowning, associated with lots of injuries to the brain." The medical examiner also concluded that she had been sexually assaulted, based on findings that the victim's anus was dilated, the feces had been impacted and her hymen was torn.

On November 13, 1985, police investigators observed drag marks and found other items which led them to defendant's backyard where they observed a pair of girl's panties and a blanket. Thereafter, they found a tool box with defendant's name on it, which contained the victim's pants, shoes and socks.

When defendant arrived home from school on November 13th, he and his mother were taken to police headquarters for questioning. Thereafter, he and his father went to the Ocean County prosecutor's office for further questioning. At 8:55 p.m., defendant signed a form which indicated that he was waiving his *Miranda* rights. At 12:15 a.m., on November 14, 1985, defendant again signed that form and agreed to make a formal tape recorded statement in which he recounted that Barbara had approached him in the wooded path behind his house. When she came at him with a knife, he threw a board at her rendering her unconscious. He then dragged her body from his backyard, through an adjoining wooded path, across the street and left the body in the creek where it was found. While he was doing this, he claimed, the victim's pants, shoes, socks and panties had fallen off.

In an affidavit dated January 19, 1993 defendant's attorney, Bonnie Richman, Esquire, stated that during his confinement in the Juvenile Detention Center, he complained of difficulty sleeping and of hearing voices. In preparation for the waiver hearing, Richman retained two experts, Dr. Kuvin and Dr. Hollander, to determine whether, based on defendant's complaints, he could

defeat removal of the case to adult court or mount an insanity defense.

Dr. Seymour Kuvin, a psychiatrist, stated in his report to defense counsel that during the commission of the crime, defendant suffered an "isolated explosive disorder." Dr. Kuvin concluded:

*OPINIONS AND RECOMMENDATIONS*

An isolated explosive disorder is defined as "The essential feature is a single discrete episode of failure to resist an impulse that led to a single violent, externally directed act which had a catastrophic impact on others and for which the available information does not justify the diagnosis of schizophrenia, antisocial personality disorder or a conduct disorder." Shawn fits all of the criteria for this diagnosis inasmuch as he never committed a violent, externally directed act before. (The BB gun incident was an accident.) Moreover, there is no evidence of schizophrenia, antisocial personality or a conduct disorder. This examiner is desirous of reviewing his school records to determine whether or not there were any behavioral disorders noted there, but in the absence of those, that certainly would confirm the fact that he is suffering from an isolated explosive disorder. This being the case, it becomes necessary to improve personality controls through appropriate means. This examiner is convinced that with enrollment in the program for intensive education at an institution such as Yardville or Jamesburg, that personality strengthening could be accomplished prior to Shawn becoming a teen. He admits to committing a heinous act although alleging that it was done in self-defense. He is extremely remorseful and rueful about the situation and does admit to the situation. Hence, this examiner is of the opinion that in all medical probability, the prognosis is relatively good.

Dr. Kuvin thought that defendant was remorseful and that his prognosis was good. The diagnosis included "reactive depression." Dr. Kuvin also stated that he was "fully convinced that [defendant] had not intended to murder the victim and certainly did not do so knowingly and purposely." There was no history of mental illness or any evidence of organic brain damage. Dr. Kuvin finally stated in a supplemental report, after a review of school and forensic records: "This examiner cannot justify a diagnosis of schizophrenia or a conduct disorder. He certainly has the capabilities of guilt formation and morality; hence, he is not suffering from an antisocial personality disorder."

Dr. Harriet Hollander, a clinical psychologist, who actually testified at defendant's juvenile waiver hearing in support of the Family Part retaining jurisdiction, diagnosed him as having suf-

fered from an "atypical psychosis" during the commission of the crime. According to Dr. Hollander, this disorder is marked chiefly by "delusions, hallucinations ... loosening of the associations" and may be diagnosed with only one such occurrence. Dr. Hollander's diagnosis was based primarily on her interview with defendant in which he claimed that within the year before the homicide he had been directed by a voice that was trying to "drive out the good in him and put in the bad." The defendant also stated in his interview that the voice told him to defend himself against the victim and then to hide the body after the homicide. Dr. Hollander concluded that defendant appeared "highly remorseful" and not "beyond the reach of present treatment modalities." She maintained her opinion that defendant could be rehabilitated despite introduction of evidence by the State at the delinquency hearing that defendant, a couple of months prior to the murder, had taken a pipe and banged it against a telephone pole and said "I wish this was [the victim's] face." Dr. Hollander was also made aware at that same hearing that defendant had asked the victim out repeatedly and had been rejected "to a point where she indicated to her mother ... that he was harassing her."

An expert for the State, Dr. Sadoff, a forensic psychiatrist, disagreed sharply with the evaluations by both experts for the defense. Dr. Sadoff claimed that defendant's testimony was not consistent with the autopsy report. Specifically, although defendant denied that he sexually assaulted the victim, the autopsy report states that the victim suffered from "vaginal hemorrhage due to laceration of the hymen and that she had a dilated anus indicating penetration ... in a violent manner." The victim also suffered injuries inconsistent with self-defense such as kidney damage resulting from a severe blow and excessive swelling of the head beyond that which could be expected from "throwing a board" in self-defense, as defendant claimed.

Dr. Sadoff concluded:

> In sum, I find no psychotic illness in Shawn Milne. He is best described as having an antisocial personality disorder and in my opinion, he is currently attempting to cover up his actions and to defend himself for what he has done to

Barbara Harrison. There is little evidence of remorse and a great feeling of justification because he believes this was done in self-defense.

> Mr. Milne is currently mentally competent to proceed legally in that he does understand the nature and consequences of his current legal situation and can work with counsel in preparing his defense. With respect to his state of mind at the time of the killing, there is no indication that he was psychotic and there is no indication that he did not act knowingly and purposely and there is no indication that he did not know the nature and quality of his act or that what he was doing was wrong.

Dr. Sadoff found the defendant without remorse. Instead, he found defendant self-serving and defensive. Dr. Sadoff attributed the "voices" that directed defendant during the crime as "not psychotic ... but more of a voice he hears under stress," especially because by defendant's own accounts, the voices did not compel the crime but only its cover up. Dr. Sadoff found defendant mentally competent, but perhaps suffering from an "antisocial disorder."

According to her sworn statement, defendant's attorney, Richman, did not pursue a diminished capacity defense based on her assessment of the expert's reports, stating that she "did not believe that the defense would be able to sustain its burden of proving the existence of a mental disease or defect by a preponderance of the evidence as required by the diminished capacity statute at that time." Defendant now argues that under the amended statute, in the absence of the preponderance of the evidence requirement of a defendant, the requisite evidentiary threshold could be met. This contention forms the basis of defendant's claim for post-conviction relief.

We point out that none of the three experts involved at the preliminary stages of this matter specifically expressed any articulated opinion on the "mental disease or defect state of mind" issue under *N.J.S.A.* 2C:4-2 which concerns us here. The experts at the time most likely were more concerned with defendant's ability to stand trial, a possible insanity defense, or his prospects of rehabilitation within the juvenile justice system.

### III

We are satisfied that defendant may raise his burden-shifting constitutional error claim under the *Humanik–Moore*[1] cases on a post-conviction relief petition. The Supreme Court entertained such a claim in *State v. Reyes*, 140 *N.J.* 344, 658 *A.*2d 1218 (1995). The Court considered the *Humanik* claim on the merits but deemed counsel's failure to raise a proper objection at trial "harmless error" because the evidence presented did not justify a jury submission on the diminished capacity issue. The issue of diminished capacity simply "was not present" in the case, *id.* at 365, 658 *A.*2d 1218, so defendant could not have been prejudiced at trial by any error in the instruction to the jury.

We are also satisfied that the *Humanik* decision corrected "structural error" in the trial process, constituted "new law," and requires full retroactive application, not merely limited prospective application or so-called "pipeline" retroactivity, applicable only to cases still on direct appeal and presently unresolved. We so conclude because *Humanik* ruled that the burden of proof on a defendant imposed by the statute, *N.J.S.A.* 2C:4–2,[2] was an unconstitutional burden-shifting. In *State v. Purnell*, 161 *N.J.* 44, 55, 735 *A.*2d 513 (1999), our Supreme Court ruled that the holding in *State v. Anderson*, 127 *N.J.* 191, 603 *A.*2d 928 (1992) (4–3), reallocating the fact-finding function from judge to jury on the

---

[1] *State v. Moore*, 122 *N.J.* 420, 431, 585 A.2d 864 (1991).

[2] 2 *N.J.S.A.* 2C:4–2 then stated:

2C:4–2  Evidence of mental disease or defect admissible when relevant to element of the offense.

Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense. *Mental disease or defect is an affirmative defense which must be proved by a preponderance of the evidence.* N.J. Stat. Ann. § 2C:4–2 (emphasis supplied).

[*Humanik*, 871 *F.*2d at 434.]

materiality element of perjury, did not command full retroactive application because it was not "intended to enhance the reliability of the fact-finding process." *Purnell,* 161 *N.J.* at 55, 735 *A.*2d 513. However, in the course of that opinion, the Court tellingly said: "If the old rule had, for example, shifted the allocation of the burden of proof regarding the element of materiality, then that rule substantially would have impaired the truth-finding process." *Purnell,* 161 *N.J.* at 55, 735 *A.*2d 513. Here, in the case before us, under *N.J.S.A.* 2C:4–2, the statute in effect in 1987 unconstitutionally imposed the burden of proof on defendant and is claimed to have substantially discouraged the defendant's chance of advancing evidence of diminished capacity before the jury to negate a mental element of the offense.

As to the reliance and impact prongs of retroactivity, *Purnell,* 161 *N.J.* at 61–62, 735 *A.*2d 513, we have no doubt that the criminal justice system relied on the statute, but for less than a decade; full retroactivity may have some temporary impact on the administration of justice. We have no empirical way of judging this factor. Over a dozen years have elapsed since *Humanik* was decided in 1989 and the statute was corrected in 1990 by the Legislature. Thus, the impact of full retroactivity, though difficult to calculate, is probably not onerous. But we are persuaded there was a constitutional due process violation, one which requires "thoughtful and thorough consideration." *State v. Preciose,* 129 *N.J.* 451, 478, 609 *A.*2d 1280 (1992). *Cf. State v. Knight,* 145 *N.J.* 233, 258, 678 *A.*2d 642 (1996) (full retroactivity not required where earlier rule did not substantially impair truth-finding process). In the end, retroactivity analysis "often turns more generally on a 'court's view of what is just and consonant with public policy in the particular situation presented,'" *State v. Nash,* 64 *N.J.* 464, 469, 317 *A.*2d 689 (1974), than on analytical niceties. We conclude that the evidentiary threshold requirement set out in Part V below is an adequate safeguard for the fair administration of full retroactivity to this type of due process claim. A truly frivolous claim can be weeded out at this point.

Also, a retrial would be confined essentially to the defendant's state of mind at the time of the commission of the crime. Defendant has never denied he killed the victim.

## IV

■■ The next consideration is whether defendant's *Humanik* claim should be barred by *R.* 3:22–5 [3] (prior adjudication) or *R.* 3:22–12 [4] (five-year-time-bar). We conclude that in this situation it should not be barred.

■■ Our courts have relaxed procedural bars on PCR claims, belated or successive, where a substantial claim is asserted that should be addressed on the merits. *R.* 1:1–2. We adopt Justice Stein's view where he expressed:

When appropriate, the procedural bars imposed by *Rules* 3:22–4, 3:22–5, and 3:22–12 may be asserted to preclude post-conviction relief, but their use should not be shaped or influenced in the slightest by federal courts' restrictive standards for allowing or disallowing habeas review. In such instances, an abbreviated reference to underlying meritorious issues may be useful in demonstrating that reliance on the procedural bar has caused no injustice. However, when meritorious issues are raised that require analysis and explanation, our traditions of comprehensive justice will best be served by decisions that reflect thoughtful and thorough consideration and disposition of substantive contentions.

*State v. Preciose,* 129 *N.J.* 451, 477–78, 609 *A.2d* 1280 (1992) (noting the effect of a state procedural ruling on the defendant's ability to pursue federal habeas relief,

---

[3] *R.* 3:22–5 states:

3:22–5.  Bar of Ground Expressly Adjudicated

A prior adjudication upon the merits of any ground for relief is conclusive whether made in the proceedings resulting in the conviction or in any post-conviction proceeding brought pursuant to this rule or prior to the adoption thereof, or in any appeal taken from such proceedings.

[4] *R.* 3:22–12(a) states:

3:22–12.  Limitations

(a) General Time Limitations.  A petition to correct an illegal sentence may be filed at any time.  No other petition shall be filed pursuant to this rule more than 5 years after rendition of the judgment or sentence sought to be attacked unless it alleges facts showing that the delay beyond said time was due to defendant's excusable neglect.

\* \* \* \*

and observing that "[w]e are not so convinced of our infallibility, or so jealous of our sovereignty, as to deem federal habeas review an undesirable intrusion on adjudications.").

*See State v. Martini,* 144 *N.J.* 603, 613, 677 *A.*2d 1106 (1996) ("[W]hen 'meritorious issues are presented, our interest affording defendants access to both state post-conviction and federal habeas review outweighs our interest in finality....' "). *See also State v. Murray,* 162 *N.J.* 240, 251, 744 *A.*2d 131 (2000) (injustice exception to time-bar applied in a conflict of interest context).

We conclude that relaxation of the procedural bars of prior adjudication and the five-year period are warranted in this case. The *Humanik* issue goes to the fundamental principle of the adversarial process, the State's obligation to prove every element of the crime beyond a reasonable doubt. *In re Winship,* 397 *U.S.* 358, 364, 90 *S.Ct.* 1068, 25 *L.Ed.*2d 368 (1970). This issue unfortunately has evaded forthright consideration to date in this case. Without dispute, the defendant, tried as an adult for a crime committed at age fifteen, potentially was impeded at trial in pursuing a diminished capacity defense by an unconstitutional statute, *N.J.S.A.* 2C:4-2.

After defendant's trial and the rejection of his direct appeals in 1990, the *Humanik* issue was raised by him in a timely manner in his first PCR petition filed in July 1992. The Law Division judge, in March 1993, denied this PCR petition on the ground that *Humanik* did not apply to PCR petitions, relying upon *State v. Culley,* 250 *N.J.Super.* 558, 564, 595 *A.*2d 1098 (App.Div.1991). Appellate counsel (not present counsel) for defendant inexplicably failed to pursue the *Humanik* issue on the appeal, which was affirmed by this court in August 1994. Our Supreme Court denied certification in November 1994. 139 *N.J.* 186, 652 *A.*2d 174 (1994).

In June 1995, eight months after defendant's PCR petition was rejected by our courts, our Supreme Court rejected *Culley,* and entertained a *Humanik* claim in a PCR proceeding. *Reyes,* 140 *N.J.* at 358, 365, 658 *A.*2d 1218. Thus, not until 1995 was defendant clearly entitled to pursue his *Humanik* claim which he

had timely raised in his first PCR petition in 1992. He pursued federal habeas relief in 1997. The State opposed the petition, relying in part on defendant's failure to exhaust available state remedies. In October 1999, federal Judge Cooper stayed the proceeding before her to permit exhaustion of state court remedies. This routed defendant back to state court where he filed this second PCR petition in 2000.

We cannot criticize current counsel for resorting to federal court in this circumstance. Nor do we think it appropriate now to deny a plenary hearing in state court on the *Humanik* issue, given the complex procedural history in this case. *See State v. Afanador*, 151 *N.J.* 41, 53, 697 *A.*2d 529 (1997). We do not decide whether defendant is entitled to a new trial on the issue of his mental state and alleged diminished capacity. We do order a plenary hearing on remand to allow defendant the chance to prove that he could have presented a triable jury issue, if allowed to do so at trial.

V

We come to the question of the scope of the remand for a plenary hearing. On the remand:

1. Defendant must prove that the statute itself, *N.J.S.A.* 2C:4-2, dissuaded him from presenting evidence of diminished capacity, i.e., a mental disease or defect. In other words, defendant must establish the truth of the assertions in the Richman affidavit—that the burden of proof requirement in the statute discouraged the defense's efforts in this respect. If the judge on the remand is not convinced of this assertion but believes that the evidence was not pursued or presented on the defendant's diminished capacity because either unavailable or implausible, that would be the end of the matter; in such a context, any harm generated by the statutory text, even though of a constitutional dimension, would be truly as "harmless" as the jury instruction error claimed in *State v. Reyes*, 140 *N.J.* at 365, 658 *A.*2d 1218.

2. The defendant must establish by credible evidence the existence of a jury question on the diminished capacity issue at time of the crime in a *N.J.R.E.* 104(a)-type hearing, applying the principles on this question set out in existing case law. *See, e.g., State v. Reyes,* 140 *N.J.* 344, 354–65, 658 *A.*2d 1218 (1995); *State v. Galloway,* 133 *N.J.* 631, 641–59, 628 *A.*2d 735 (1993); *State v. Oglesby,* 122 *N.J.* 522, 531, 585 *A.*2d 916 (1991); *State v. Moore,* 122 *N.J.* 420, 435–37, 585 *A.*2d 864 (1991). *See also Cannel, Criminal Code Annotated,* comment *N.J.S.A.* 2C:4–2 at 223–226 (2002).

The contextual contours of a *N.J.R.E.* 104(a) hearing (earlier called a Rule 8 hearing) are set out in *State v. Breakiron,* 108 *N.J.* 591, 617–20, 532 *A.*2d 199 (1987). The trial-level judge must determine simply the admissibility of proofs and not their "probative effects." *Id.* at 619, 532 *A.*2d 199.

A Rule 104(a) hearing is especially appropriate in the case before us because obviously none of the three experts employed at the pretrial stage back in 1987 were asked to analyze the evidence and offer an opinion on the "diminished capacity" defense to knowing and purposeful murder within existing legal and medical guidelines. As noted, their efforts, in our view, were clearly directed to defendant's potential for rehabilitation within the juvenile justice system, his ability to stand trial, or a potential insanity defense. Any proffer on remand by these or any other experts offered by either side must, of course, articulate their opinions within the context of the "mental disease or defect" contemplated by *N.J.S.A.* 2C:4–2 and our augmenting case law.

The State may offer proofs on remand if it desires and believes they may be helpful to the judge in making the threshold decision on admissibility.

VI

Finally, on the remand we direct the Assignment Judge to designate a different trial judge for the evidentiary hearing on the admissibility of evidence under *N.J.R.E.* 104(a) and the ultimate

decision on defendant's right to post-conviction relief. *R.* 1:12–1(d) and (f). *See State v. Gomez,* 341 *N.J.Super.* 560, 579, 775 *A.*2d 645 (App.Div.), *certif. denied,* 170 *N.J.* 86, 784 *A.*2d 719 (2001), where we said "it is appropriate to have the case referred to a different trial judge who will be unfettered by comments on the record which could be interpreted as an advance evidential ruling on admissibility." *See also N.J. Div. of Youth & Family Services v. A.W.,* 103 *N.J.* 591, 617–18, 512 *A.*2d 438 (1986).

## VII

Defendant raises one further point. He claims that his conviction for murder "must be vacated because the Appellate Division's juvenile waiver decision was based upon an incorrect assessment of [defendant's] guilty plea and resulting juvenile record." We find this claim clearly without merit, *R.* 2:11–3(e)(2), and precluded by the "law of the case" doctrine. *State v. Reldan,* 100 *N.J.* 187, 208, 495 *A.*2d 76 (1985); *State v. Hale,* 127 *N.J.Super.* 407, 411, 317 *A.*2d 731 (App.Div.1974); *see also State v. R.G.D.,* 108 *N.J.* 1, 9, 527 *A.*2d 834 (1987).

Reversed and remanded.