**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2192-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JERMAINE A. MCFADDEN,

    Defendant-Appellant.

_____

Submitted May 20, 2025 – Decided July 28, 2025

Before Judges Gooden Brown and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 13-12-2252.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Mark Zavotsky, Designated Counsel, on the brief).

Esther Suarez, Hudson County Prosecutor, attorney for respondent (Patrick F. Galdieri, II, Assistant Prosecutor, of counsel and on the brief; Josemiguel Rodriguez, Law Clerk, on the brief).

PER CURIAM

This case returns to us following our remand for an evidentiary hearing on defendant's first post-conviction relief (PCR) petition. In his petition, defendant raised ineffective assistance of counsel (IAC) claims pertaining to trial counsel's failure to investigate raising a diminished capacity or intoxication defense in connection with defendant's guilty plea to murdering his wife, Crystal Reid, by strangling her and stabbing her ninety-seven times after a night of drinking. He was sentenced in accordance with a negotiated plea agreement to the minimum term of thirty years in prison, with thirty years of parole ineligibility. After conducting an evidentiary hearing during the remand proceedings, the PCR judge issued an order and written opinion on January 17, 2024, denying defendant's petition and concluding that defendant failed to establish IAC.

Defendant now appeals from the January 17, 2024 order, raising the following arguments for our consideration:

> DEFENDANT RECEIVED [IAC] FOR FAILURE TO COMMUNICATE AND ADVANCE DIMINISHED CAPACITY AND INTOXICATION DEFENSES AS THEY PERTAINED TO HIS ABILITY TO FORM THE REQUIRED MENS REA FOR FIRST-DEGREE MURDER.
>
> (A) Applicable Law.

(B)   Defen[se] Trial Counsel's Testimony At The PCR Evidentiary Hearing[ ]Clearly Established He Failed To Sufficiently Investigate And Advance Diminished Capacity And Intoxication Defenses.

Based on our review of the record and the applicable legal principles, we affirm.

I.

In our unpublished opinion remanding for an evidentiary hearing, we recounted the facts from the State's investigation of the homicide as follows:

> On August 9, 2013, defendant and his wife were staying in a bedroom at the Jersey City apartment of Monique Glaster, defendant's cousin. Glaster's sister was visiting at the time. Throughout the night, Glaster and her sister saw defendant come out of the bedroom several times. Glaster noticed defendant "was very intoxicated . . . and was swaying back and forth when he walked."
>
> At some point before 11 p.m., defendant came out of the bedroom and "asked [Glaster] for a drink." Defendant returned to the bedroom with a beer, but emerged again a short time later, "shirtless with sweatpants hanging off [of] his waist." Defendant sat on Glaster's bed and told her and her sister, "I think I did something bad"; "I did something crazy." When the sisters asked what he meant, defendant said he "would tell [them] later," and returned to his bedroom.
>
> Shortly thereafter, defendant telephoned his sister, Shaunta Washington, and told her, "I just did some bullshit." When Washington asked what defendant was "talking about," he responded he "just killed [Reid]." Washington asked how it happened, and

3

defendant replied, "I choked her, and then I stabbed her up." After ascertaining his whereabouts, Washington told defendant she was "on [her] way."

While Washington and defendant were on the phone, Glaster overheard defendant say he was at "Monique's house." Concerned that defendant was inviting people to her apartment in his intoxicated state, Glaster grabbed the phone from defendant and talked to Washington. Washington informed Glaster that defendant had told her that "he did something to some girl in the room."

Glaster promptly went into the bedroom where defendant and Reid were staying and saw Reid's "naked and lifeless body lying face up on the bed." Glaster observed multiple "holes" in Reid's stomach and a knife from her kitchen alongside the mattress. When Glaster's sister asked defendant what he did to Reid, defendant replied he "didn't do anything" and attempted to leave the apartment. The sisters tussled with defendant to prevent him from leaving, while Glaster called the police.

After police and paramedics arrived, Reid was pronounced dead at 11:53 p.m. An autopsy later revealed that Reid died from strangulation and "[sixteen] stab wounds in the chest area, [fifty-seven] stab wounds [to her] abdomen . . . , [fourteen] stab wounds [to her] left [side,] and [ten] stab wounds [to her] right [side]."

[State v. McFadden, No. A-3765-19 (App Div. July 6, 2022) (slip op. at 4-6) (omissions and alterations in original).]

Defendant was later charged in a Hudson County indictment with murder, N.J.S.A. 2C:11-3(a)(1) to (2) (count one); third-degree possession of a weapon, a knife, for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count two); and fourth-degree unlawful possession of a knife, N.J.S.A. 2C:39-5(d) (count three). He entered a negotiated guilty plea to the murder charge in exchange for the State's recommendation of the minimum sentence for murder, see N.J.S.A. 2C:11-3(b)(1), and the dismissal of the remaining counts of the indictment.

At the plea hearing, defendant assured the trial court that he had discussed the "case, its facts and circumstances, as well as [his] [r]ights and any defenses that [he] may have to th[e] charge with [his] lawyer before deciding to plead guilty." McFadden, slip op. at 6-7 (alterations in original). He also confirmed that he understood his sentencing exposure. Id. at 7. "Upon further questioning by the judge, defendant confirmed that he understood the rights he was giving up, that he was not forced, threatened, or pressured to plead guilty, and that no other promises were made to him other than the ones discussed on the record." Ibid.

> Turning to the factual basis for defendant's plea, the following exchange ensued between defendant and trial counsel:
>
> [DEFENSE COUNSEL]: [O]n August 9, 2013, were you in Jersey City?

[DEFENDANT]:  Yes.

[DEFENSE COUNSEL]:  And you were with Crystal Reid at that time?

[DEFENDANT]:  Yes.

[DEFENSE COUNSEL]:  While you were with her at that time, you had an altercation with her?

[DEFENDANT]:  Yes.

[DEFENSE COUNSEL]:  During that altercation, you put your hands around her throat and strangled her?

[DEFENDANT]:  Yes.

[DEFENSE COUNSEL]:  After that, you stabbed her a number of times?

[DEFENDANT]:  Yes, sir.

. . . .

[DEFENSE COUNSEL]:  And you caused her death?

[DEFENDANT]:  Yes.

At that point, the judge joined the colloquy and questioned defendant as follows:

[COURT]:  You knew when you were strangling her and stabbing her that . . . death was a probable result, is that correct?

6

[DEFENDANT]: Yes.

[COURT]: You knew what you were doing, that's the point.

[DEFENDANT]: No.

[COURT]: You didn't know what you were doing?

[DEFENDANT]: No.

[DEFENSE COUNSEL]: When you strangled her, you knew that was going to cause her death, is that correct?

[DEFENDANT]: He asked me did I know what I was doing. I was under the influence. I didn't know what I was doing. I didn't realize until I was in Homicide hours later. So, that was the question he asked.

[COURT]: Did you know at the time, sir, when you stabbed her, that you were stabbing her?

[DEFENDANT]: No.

[COURT]: You didn't know that?

[DEFENDANT]: No.

[DEFENSE COUNSEL]: You didn't know you were stabbing her at the time?

[DEFENDANT]: No.

7

[DEFENSE COUNSEL]: When you strangled her, you knew you were strangling her, is that correct?

[DEFENDANT]: No.

The judge interjected that the factual basis was "not acceptable" and queried whether defendant was asserting a "voluntary intoxication through alcohol" defense. After further discussion between the judge and the attorneys, the plea colloquy continued as follows:

[DEFENSE COUNSEL]: You called your sister and said [you] just did something bad to [Reid]. Right after this happened, do you remember saying that [you] don't remember?

[DEFENDANT]: That's what the [d]iscovery said, though.

[COURT]: If he's not prepared to accept responsibility for what he did, I can't accept the plea. The law requires . . . that [defendant's] conduct in this matter be characterized as either purposeful or knowing.

Just for your own education, sir, you should understand, voluntary intoxication is not a defense ordinarily to the charge of murder.

[DEFENDANT]: So, it don't lead to aggravated manslaughter. It is still murder.

8

[COURT]: Aggravated manslaughter is not murder. It is a lesser form of homicide. It is not murder.

[DEFENDANT]: All right. You want me to just—.

[COURT]: Here's the problem as I see it, sir, that, if in fact what your lawyer asked you is true, that immediately you contacted someone and informed them that you have done something bad, it's clear you knew what you were doing.

[DEFENDANT]: I said I didn't remember, but I guess I did. Like I said, that's the paperwork saying yes. I guess I did it, yes.

[COURT]: There's never been a question as to whether or not you did it.

[DEFENDANT]: Yeah.

[COURT]: The question is, when you did it, did you know that what you were doing was probably going to cause her death?

[DEFENDANT]: Yes.

[Id. at 7-11 (omissions and alterations in original).]

Thereafter, the judge sentenced defendant in accordance with the plea agreement. Id. at 11.

Defendant's presentence report, which his attorney confirmed was accurate, referenced an excerpt from a psychological evaluation dated January 18,

9

2000, that was prepared by Edward J. Dougherty, Ed.D., when defendant was almost fifteen years old. The evaluation was obtained to determine "[defendant's] competency to stand trial" on aggravated sexual assault related charges that were pending at the time. Although the psychologist concluded that defendant was competent to stand trial, he recommended that "care . . . be taken to explain court proceedings and options to him in simple language," checking his comprehension "by asking him to explain it in his own words."

In the evaluation, defendant was described as having "sever[e] intellectual and academic limitations." According to the psychologist, defendant "function[ed] at a mildly mentally retarded level" and was "deficient in his ability to reason abstractly, particularly in verbal areas." The psychologist also noted that as a young child, defendant showed "indications of psychiatric difficulties, specifically, paranoia, and brief auditory hallucinations." However, "it [was] unclear whether [the psychiatric difficulties were] the result of [defendant's] neurological deficits or whether he [was] beginning to develop a more specific psychiatric disorder."

[Id. at 12-13 (omission and alterations in original) (footnote omitted).]

Defendant filed a timely PCR petition, asserting, among other things, that he was denied the effective assistance of counsel by his attorney's failure "to investigate his learning and neurological disabilities, cognitive impairments, and history of mental illness" and failing "to seek a competency evaluation or raise diminished capacity and intoxication as affirmative defenses." Id. at 14.

10

After defendant was assigned PCR counsel, he filed a supplemental certification, averring that he had asked his trial attorney for "a competency examination" and that he "prepare" an intoxication defense. According to defendant, he informed his attorney that he had been "drinking heavily on the night in question." He had consumed "multiple beers, [and] vodka." He had also ingested "mollies" and "used PCP." Defendant stated he "remember[ed] nothing about that night" and "[e]verything [he] kn[e]w about that night . . . [he had] heard from someone else." Defendant further certified he "did not want to plead guilty but felt [he] had to" because his attorney "only met with [him] two times before the plea," "never discussed trial strategy other than [insisting] that [he] take a plea," and "did not re[]assure [him] that he could go to trial and be prepared."

[Id. at 14-15 (omission and alterations in original).]

The PCR judge denied defendant's petition without an evidentiary hearing, finding defendant failed to establish a prima facie case of IAC. Id. at 15. We disagreed. As a result, we reversed and remanded for an evidentiary hearing to allow defendant

to fully present his IAC claim regarding the reasonableness and thoroughness of trial counsel's investigation of defendant's mental state at the time of the homicide, including the viability of raising a diminished capacity or intoxication defense. In the context of this claim, the judge may also consider defendant's assertion that trial counsel failed to adequately discuss these possible defenses with him.

[Id. at 24, 27.]

11

An evidentiary hearing was conducted on February 9, 2023, during which defendant and his attorney, a seasoned attorney with nearly twenty years of experience in "mostly criminal defense" cases, both testified. When asked how often he had met with defendant to discuss the case, counsel replied, "I am sure I met with him a bunch of times. On a charge of this magnitude I am sure I met with him a lot." Counsel also testified that, consistent with his practice, he was "sure [he] did" "discuss what [he] perceived to be the strengths and weaknesses of the State's case against [defendant]," as well as "[defendant's] chances at trial."

When asked "what course of action [he] advised [defendant] to take," counsel responded:

> [T]he facts of the case were not good for [defendant]. . . . [I]t's hard for me to recall what we spoke and didn't speak about six years ago or so . . . but I know that there was alcohol involved.
>
> . . . [S]ome statements made by him right after the incident—I didn't feel that intoxication was a defense to use. . . . [L]ike I say to every client, my job is not to make a decision. I give you your options and it is your life, you are the one who's got to make decisions for yourself.
>
> . . . [S]o I thought going to trial would not work out well given the facts of this case. But, again, like I said to every client, I leave it up to every client.

12

The one thing I do remember distinctively about [defendant] was . . . as talks progressed about the case between he and I, he did say that . . . he didn't want to put the family through any more than they have already gone through in terms of trying to work out a plea rather than going to trial.

. . . .

. . . [I]t's probably the first defendant charged with a crime like this who ever said that to me. That he was putting—I felt—the victim's family at the forefront and that stuck out with me.

Counsel also recounted the plea negotiations between his client and the State as follows:

I am sure there were extensive negotiations with the State in terms of mitigating factors.

But they were not budging from [thirty] years. And, of course, I presented—we have options. You can go to trial. . . . [Y]ou can take a plea. And completely [defendant's] call.

And, again, like I said, the one thing I do remember him saying was that . . . he didn't want to go to trial. He didn't want to put the family through any more than they ha[d] already gone through.

Counsel testified that he "knew . . . from the police reports" that "[defendant] was drinking heavily that night." However, after researching the law, he did not consider an intoxication defense a viable strategy because he "didn't think it rose to the level to negate an element of the crime." He explained:

13

[I]n terms of intoxication, I do remember talking to [defendant] about the fact that after the incident he immediately made a call to somebody saying I did something pretty bad. Or something to that effect.

. . . .

. . . [S]o that concerned me a little bit in terms of that he knew what he did. . . . [S]o that phone call I thought was kind of damning for his case.

Counsel also acknowledged "from looking at the [plea hearing] transcript," "that there was some hesitancy on behalf of [defendant] to admit what he did that night." According to counsel, although defendant was nervous and hesitant in court as defendants typically are, defendant "told [counsel] he was aware of what he [had done]."

When asked whether he was "satisfied with the legal services . . . [he] provided to [defendant] in this matter," counsel said "[a]bsolutely." Counsel believed he fulfilled "the only promise" he ever makes to a client, which is "to work [his] hardest" for the client. Counsel elaborated:

Because I thought the facts of the case were awful. . . . I think if he went to trial he could have gotten a much more severe sentence. And, again, I followed the request of my client. When I spoke to him about his options, he said he wanted to plea[d]. He knew what he did was wrong and that he didn't want to put the family through any more than they ha[d] already gone through.

I followed his wishes.

14

During his testimony, defendant expressed his belief that "from the beginning," his attorney had "[given] up" and "there was nothing he could do." According to defendant, he did not see his attorney "that many times." Defendant maintained that he could not "remember" or "recall" anything from the night in question, not "[e]ven the phone call." According to defendant, "[t]he last thing [he] remember[ed] was using drugs and drink[ing] alcohol."

When asked whether he told his attorney he "wanted to go to trial," defendant responded:

> I didn't tell him I wanted to go to trial because I d[id]n't know what [was] going to happen. I d[id]n't know what [was] going on. I would have preferred a better plea [deal], because to me—if you ask me—this whole situation was a big mistake. It was a mistake. It should have never happened. I didn't purposely murder this girl, like I planned, like, you know what I am going to stab [her]. I didn't plan it. I didn't know what I was doing. So he made me plead guilty to murder, as if a murder—like I knew what I was doing. Like I planned this. No. I[t] didn't happen like that. This is a domestic dispute. It was a mistake—a big mistake.

Defendant testified that on the day of the homicide, he drank vodka, "took a couple of pills," and "smoked some PCP." When asked whether he "underst[ood] what [he was] doing" the day of the plea hearing, defendant said:

> I am going to be honest with you. I just didn't want to go to trial with this guy and get a life sentence for a mistake.

A-2192-23

. . . .

[The judge] asked me what I did that night. I told him exactly what happened. I don't remember. That's what I said first. . . .

. . . .

. . . [Defense counsel] came back [from sidebar] and [the judge said] he's not going to accept the plea if you don't admit what you did. Okay. I am going to tell you exactly what I did what the report say[s] I did and that's what I did.

Defendant said he did not express any dissatisfaction with his attorney to the judge because this was his second attorney, "[s]o it was like pointless." Defendant was also questioned about the plea colloquy and confirmed his prior responses as follows:

Q. Do you recall the [j]udge asking if anyone forced you or threatened you or put any kind of pressure on you to take a plea?

A. Yes.

Q. Do you remember saying that nobody did pressure you?

A. Yes.

. . . .

Q. Do you remember the [j]udge asking who made the decision to plead guilty?

A. I don't recall that. But probably.

Q. Do you remember responding that you made the decision to plead guilty?

A. Yes.

Q. Do you remember the [j]udge asking you if you were pleading guilty because you are in fact guilty?

A. Probably so.

Q. Do you remember responding that, yes, you were pleading guilty because you are in fact guilty?

A. Probably so. I don't remember.

Following the hearing, the PCR judge issued an order and accompanying written opinion denying defendant's PCR petition. After crediting counsel's testimony over defendant's, the judge found that defendant "failed to establish trial counsel's failure to advance intoxication or diminished capacity as defenses amounted to [IAC] as measured by an objective standard," thereby failing to establish the first Strickland/Fritz[1] prong. Regarding an intoxication defense, the judge found "[trial counsel] testified that while he knew alcohol was involved, he believed based on all of the facts an intoxication defense would not be effective at trial," a determination he made "based on both [defendant]'s

---

[1] Strickland v. Washington, 446 U.S. 668 (1984); State v. Fritz, 105 N.J. 42 (1987).

17

attempt to keep the Glaster sisters from entering the room where the victim was, and on statements made by [defendant] shortly after the incident on the night in question, as well as counsel's legal research."

The judge explained:

> [Trial counsel] testified that he researched the issue of intoxication and believed these statements [after the incident] and [defendant]'s actions, including his attempt to leave the scene, support[ed] a finding that [defendant] knew what he had done, and therefore, [defendant]'s intoxication did not rise to the level to negate an element of the crime. . . .
>
> . . . .
>
> [Trial counsel] testified that he was aware that [defendant] had . . . consumed alcohol on the evening in question based on conversations with [defendant], as well as from the discovery. [Trial counsel] testified that he discussed an intoxication defense with [defendant], but his research indicated that an intoxication defense would likely not be successful due in part to [defendant]'s statements on the night of the incident that he "did something crazy" and "killed someone" as well as his particularized description of how he had killed the victim. When asked if [defendant] ever told him he did not recall what happened, [c]ounsel replied that was what . . . [defendant] told the [c]ourt.

According to the judge, despite his testimony "at the PCR hearing that he drank vodka, smoked PCP, and took a couple of pills on the day in question," defendant's "testimony was extremely generalized regarding the day in

question" and his "claims [were] nothing more than 'conclusory labels'" that failed to meet the high threshold required to succeed on a voluntary intoxication defense. Further, the judge noted that defendant did "not assert[] facts that [an] investigation would have revealed" and "failed to provide his own affidavit or [an] affidavit from any of the potential witnesses [defendant] suggest[ed] should have been investigated detailing what information they would have provided."

As to diminished capacity, the judge found "[c]ounsel was [not] deficient in failing to order a competency evaluation, as one had been ordered by the [trial c]ourt." The judge expounded:

> The [c]ourt had ordered a competency evaluation . . . prior to [trial counsel] substituting into the case. [Defendant] has failed to detail what any educational or mental health records would have disclosed. Nor has [defendant] provided any certification or affidavit from any potential mental health, medical, or educational expert detailing their anticipated testimony. Based on the paucity of the information provided by [defendant], counsel cannot be found to have been ineffective for not ordering additional mental health or educational records.

The judge considered counsel's awareness of defendant's "mildly retarded" diagnosis. However, defendant was able to "intelligently" "communicate" with trial counsel and "understand everything that they discussed regarding [the] case" and demonstrated no deficits in that regard. As

19

a result, the judge found counsel's decision to "not seek any additional medical reports or school records concerning [defendant's] mental status" objectively reasonable.

Likewise, the judge found defendant failed to show he suffered prejudice under the second Strickland/Fritz prong. First, defendant "failed to offer testimony to contradict [trial counsel]'s recollection of their meetings," but "merely offered at the PCR hearing that he did not want to go to trial 'with this guy' and get life." Further, defendant "conceded at the PCR hearing that he never told his attorney that he wanted to go to trial," instead "testif[ying] that he wanted his attorney to get a better plea offer." In that regard, the judge found that defendant's testimony at the hearing "support[ed counsel]'s testimony that [defendant] was clear that he did not want to go to trial on the matter and it was his desire and decision to enter a plea of guilty."

The judge was also satisfied that defendant "understood that he was facing a sentence of [thirty] years to life in prison on the charges he faced," and despite "hop[ing] for a better plea deal, no better plea offer was made" to defendant. Additionally, the judge found that defendant's decision to plead guilty "was based upon his own desire not to cause the victim's family any additional trauma," and was made "after consultation with [counsel] with respect to [the]

strengths and weaknesses of the case." As such, the judge found no basis in the record "support[ing] a finding that there is a reasonable probability that but for counsel's errors, [defendant] would not have plead[ed] guilty and would have insisted on going to trial." According to the judge, even if counsel's performance was deficient, "the record d[id] not demonstrate that [defendant] suffered prejudice as a result." This appeal followed.

II.

Our review is guided by well-established principles. Following an evidentiary hearing, we afford deference to a PCR court's factual findings "supported by sufficient credible evidence in the record." State v. Pierre, 223 N.J. 560, 576 (2015) (quoting State v. Nash, 212 N.J. 518, 540 (2013)). This is so because "[a]n appellate court's reading of a cold record is a pale substitute for a trial judge's assessment of the credibility of a witness [the judge] has observed firsthand." Nash, 212 N.J. at 540. However, a PCR court's legal conclusions are reviewed de novo. State v. Harris, 181 N.J. 391, 415 (2004).

"[PCR] is New Jersey's analogue to the federal writ of habeas corpus." Pierre, 223 N.J. at 576 (quoting State v. Preciose, 129 N.J. 451, 459 (1992)). Rule 3:22-2 recognizes five cognizable grounds for PCR, including a "[s]ubstantial denial in the conviction proceedings of defendant's

[constitutional] rights," R. 3:22-2(a), which encompasses the right to the effective assistance of counsel at issue in this appeal, Nash, 212 N.J. at 541-42.

To establish a prima facie claim of the denial of the effective assistance of counsel as contemplated under Rule 3:22-2, a defendant must demonstrate that counsel's performance fell below the objective standard of reasonableness set forth in Strickland v. Washington, 466 U.S. 668, 687-88 (1984), and adopted in State v. Fritz, 105 N.J. 42, 49-58 (1987), and that the outcome would have been different without the purported deficient performance. Stated differently, a defendant must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687; Fritz, 105 N.J. at 58.

To satisfy the first prong, a defendant must "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and "that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88. "[I]n making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." Id. at 689. As such, a defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be

22

considered sound trial strategy.'" Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

"Merely because a trial strategy fails does not mean that counsel was ineffective." State v. Bey, 161 N.J. 233, 251 (1999). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. For that reason, "[t]he quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of defendant's guilt." State v. Castagna, 187 N.J. 293, 314 (2006).

To satisfy the second Strickland/Fritz prong, "[t]he error committed must be so serious as to undermine the court's confidence in the jury's verdict or result reached." State v. Chew, 179 N.J. 186, 204 (2004) (citing Strickland, 466 U.S. at 694). This prong generally requires that a defendant establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

To establish the prejudice prong in the context of a guilty plea, a defendant must show "that there is a reasonable probability that, but for counsel's errors,

23

[the defendant] would not have pled guilty and would have insisted on going to trial." State v. DiFrisco, 137 N.J. 434, 457 (1994) (alteration in original) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)). To that end, "'a [defendant] must convince the court that a decision to reject the plea bargain'" and "insist on going to trial" would have been "'rational under the circumstances.'" State v. Maldon, 422 N.J. Super. 475, 486 (App. Div. 2011) (quoting Padilla v. Kentucky, 559 U.S. 356, 372 (2010)). That determination should be "based on evidence, not speculation." Ibid.

Failure to meet either prong of the two-pronged Strickland/Fritz test results in the denial of a petition for PCR. State v. Parker, 212 N.J. 269, 280 (2012) (citing State v. Echols, 199 N.J. 344, 358 (2009)). That said, "courts are permitted leeway to choose to examine first whether a defendant has been prejudiced, and if not, to dismiss the claim without determining whether counsel's performance was constitutionally deficient." State v. Gaitan, 209 N.J. 339, 350 (2012) (citation omitted) (citing Strickland, 466 U.S. at 697).

Applying these principles, we are satisfied that the judge's factual findings are supported by sufficient credible evidence in the record and we agree with the judge's legal conclusion that defendant failed to establish a prima facie claim of IAC. Defendant argues that his attorney was "unprepared" and "failed to

24

conduct an adequate pretrial investigation into factors of []voluntary intoxication and diminished capacity." As to the voluntary intoxication defense, defendant maintains that while the presentence report detailed that he consumed a fifth of vodka, three to four 24-ounce beers, and drugs on the night in question, "[t]he PCR court failed to consider the specificity of this information." Defendant also asserts that an investigation into a voluntary intoxication defense would have bolstered the fact that defendant "had no memory of the event" and thus could not have had the intent to commit the crime.

As to diminished capacity, defendant submits his attorney was ineffective for "fail[ing] to investigate . . . how his mental diminished capacity in conjunction with voluntary intoxication interacted with one another to negate the requirement of forming an intent to establish murder." Defendant also points to the psychological evaluation conducted when he was fifteen years old, which left "undetermined" whether defendant's "paranoia and brief auditory hallucinations" were the result of "neurological deficits" or the beginning signs of "a more specific psychiatric disorder."

Voluntary intoxication can be a defense if it "negat[es] an element of the offense." N.J.S.A. 2C:2-8(a); see State v. Cameron, 104 N.J. 42, 52-53 (1986). "Self-induced intoxication can reduce the offense of purposeful or knowing

murder to manslaughter or aggravated manslaughter." State v. Mauricio, 117 N.J. 402, 418 (1990) (citing State v. Warren, 104 N.J. 571, 577 (1986)). To establish intoxication as a defense, evidence must show the "prostration of [defendant's] faculties such that defendant was rendered incapable of forming an intent." Cameron, 104 N.J. at 54. Put another way, "a jury issue arises only if there exists a rational basis for the conclusion that defendant's 'faculties' were so 'prostrated' that he or she was incapable of forming an intent to commit the crime." Mauricio, 117 N.J. at 418-19 (quoting Cameron, 104 N.J. at 57).

In Cameron, our Supreme Court stressed:

> [I]t is not the case that every defendant who has had a few drinks may successfully urge the defense. The mere intake of even large quantities of alcohol will not suffice. Moreover, the defense cannot be established solely by showing that the defendant might not have committed the offense had he been sober. What is required is a showing of such a great prostration of the faculties that the requisite mental state was totally lacking. That is, to successfully invoke the defense, an accused must show that he was so intoxicated that he did not have the intent to commit an offense. Such a state of affairs will likely exist in very few cases.
>
> [Cameron, 104 N.J. at 54 (alteration in original) (citation omitted).]

The <u>Cameron</u> Court identified several factors to determine whether a defendant has established a "prostration of faculties" to support an intoxication defense:

> the quantity of intoxicant consumed, the period of time involved, the actor's conduct as perceived by others (what he said, how he said it, how he appeared, how he acted, how his coordination or lack thereof manifested itself), any odor of alcohol or other intoxicating substance, the results of any tests to determine blood-alcohol content, and the actor's ability to recall significant events.
>
> [<u>Id.</u> at 56.]

Under this standard, it is not enough for a defendant to merely say he or she "felt 'pretty intoxicated,' 'pretty bad,' and 'very intoxicated,'" as these "are no more than conclusory labels, of little assistance in determining whether any drinking produced a prostration of faculties." <u>Ibid.</u>

In <u>Cameron</u>, the Court held that the defendant was not entitled to a voluntary intoxication defense instruction. <u>Id.</u> at 58. The Court expounded:

> Defendant's conduct was violent, abusive, and threatening. But with it all there is not the slightest suggestion that she did not know what she was doing or that her faculties were so beclouded by the [alcohol] that she was incapable of engaging in purposeful conduct. That the purpose of the conduct may have been bizarre, even violent, is not the test. The critical question is whether defendant was capable of forming

27

that bizarre or violent purpose, and we do not find sufficient evidence to permit a jury to say she was not.

[Id. at 57.]

Here, counsel testified that he considered a voluntary intoxication defense. However, after reviewing the evidence, including defendant's statements and actions immediately following the stabbing, and after conducting legal research, counsel did not believe the evidence would support the theory that defendant had a "prostration of faculties" on the night of the incident to support a voluntary intoxication defense. As the PCR judge astutely pointed out, "[defendant's] conclusory labels stand in stark contrast to his words and actions" on the night in question.

We acknowledge that "counsel has a duty to make 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" State v. Savage, 120 N.J. 594, 618 (1990) (quoting Strickland, 466 U.S. at 691). To that end, the judge credited counsel's testimony that he did, in fact, investigate voluntary intoxication as a possible defense before deciding it was not defendant's best option. We are satisfied defendant has failed to put forth any proofs to discredit counsel's testimony or assert sworn facts that an investigation would have revealed to change the outcome. See State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999) ("[W]hen a petitioner

claims his trial attorney inadequately investigated his case, he must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification.").

Defendant relies on the presentence report to support his claim that he had consumed a lot of drugs and alcohol on the day in question but never clarified over what period of time he consumed the substances nor provided blood alcohol tests to corroborate his claim. As stated in <u>Cameron</u>, it is not enough for defendant to merely assert that he consumed a lot of alcohol that night. 104 N.J. at 56. Although Glaster observed defendant appearing intoxicated and swaying, such vague assertions alone do not rise to the required finding that defendant suffered a "prostration of faculties," particularly when contrasted with his subsequent statements and actions. Further, despite defendant's initial assertion that he did not recall what happened on the night in question, he ultimately admitted to the murder at the plea hearing.

Defendant's diminished capacity argument fares no better. Under N.J.S.A. 2C:4-2,

> [e]vidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of

29

such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense.

"Diminished capacity is a 'failure of proof' defense: evidence of defendant's mental illness or defect serves to negate the mens rea element of the crime." State v. Reyes, 140 N.J. 344, 354 (1995) (quoting Paul H. Robinson, Criminal Law Defenses: A Systematic Analysis, 82 Colum. L. Rev. 199, 206 (1982)). "'All mental deficiencies, including conditions that cause a loss of emotional control, may satisfy the diminished-capacity defense' if accepted in the psychological field, and if 'the record contains evidence that the claimed deficiency did affect the defendant's cognitive capacity to form' the required mental state." State v. Melendez, 423 N.J. Super. 1, 32 (App. Div. 2011) (quoting State v. Galloway, 133 N.J. 631, 647 (1993)). Thus, to be entitled to a diminished capacity instruction, there must be evidence of (1) a diagnosed mental disease or disorder, and (2) a connection between that mental condition and the ability to form the requisite mental state for the crime charged. Reyes, 140 N.J. at 364-65.

Here, the judge found that counsel reviewed the previously ordered competency evaluation as well as the 2000 psychological evaluation and was aware of defendant's earlier diagnosis. Counsel did not order an independent

evaluation or further testing because counsel saw no evidence of diminished capacity and defendant had no difficulty communicating or understanding. Otherwise, as counsel testified, he "would have done something about it." We agree with the PCR judge that counsel's performance in this regard was not constitutionally deficient. We disagree with defendant's suggestion that the mere existence of the 2000 evaluation calls for a different conclusion in the absence of evidence of how the earlier evaluation affected his mental capacity as an adult or at the time of the killing.

Finally, as to either purported defense, defendant cannot demonstrate that he suffered actual prejudice because he cannot show that, but for counsel's supposed deficient performance, he would have insisted on going to trial. Trial counsel "remember[ed] distinctively" that defendant wanted to plead guilty because he "didn't want to put the family through any more than they ha[d] already gone through." The assertion "st[uck] out in [counsel's] mind" because in twenty-something years of representing "[h]undreds" of criminal defendants, including about twelve to fifteen charged with murder, this defendant was "the first . . . charged with a crime like this who ever said that to [him]." Counsel made clear that he left the decision to plead or go to trial with defendant.

31

Likewise, defendant testified that he, not trial counsel, made the decision to plead guilty. He also testified he did not tell his attorney he wanted to go to trial. Rather, he wanted a better plea deal, which the State was not offering. Therefore, even if counsel's performance had been deficient, it would have been of no moment because defendant did not want to go to trial. See DiFrisco, 137 N.J. at 457.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

32                                                          A-2192-23